955 A.2d 322 (2008)
402 N.J. Super. 495
STATE of New Jersey, Appellant-Respondent,
v.
Quadir WHITAKER, Defendant-Appellant.
No. A-4340-05T4.
Superior Court of New Jersey, Appellate Division.
Submitted May 12, 2008.
Decided September 18, 2008.
*324 Yvonne Smith Segars, Public Defender, for appellant (Kevin G. Byrnes, Designated Counsel, and on the brief).
Luis A. Valentin, Monmouth County Prosecutor, for respondent (Patricia B. Quelch, Assistant Prosecutor, of counsel and on the brief).
Before Judges PARRILLO, S.L. REISNER and GILROY.
The opinion of the court was delivered by
GILROY, J.A.D.
Defendant Quadir Whitaker was convicted under the principle of accomplice liability, N.J.S.A. 2C:2-6b(3), of having committed the crimes of first-degree robbery and felony murder. The primary question presented on appeal requires us to interpret that portion of the robbery statute, N.J.S.A. 2C:15-1a, which provides, "[a]n act shall be deemed to be included in the phrase `in the course of committing a theft' if it occurs ... in the immediate flight after the attempt [to commit a theft] or commission [of a theft]," as the phrase pertains to a defendant charged as an accomplice. Specifically, we are asked to determine whether a defendant charged as an accomplice may be found guilty of robbery by uttering an instruction to the principal, during the immediate flight from an attempted theft, to hide the weapon used during the attempted theft, after all necessary elements of the crime of robbery have *325 concluded. We answer the question in the negative.
At approximately 2:09 a.m. on December 21, 2002, Seth Mejia Hernandez was shot and killed on Marcy Street in Freehold. On October 29, 2003, a Monmouth County Grand Jury charged defendant and co-defendant Greg Davis with first-degree armed robbery, N.J.S.A. 2C:15-1 (Count One); first-degree felony murder, N.J.S.A. 2C:11-3a(3) (Count Two); first-degree knowing and purposeful murder, N.J.S.A. 2C:11-3 (Count Three); third-degree unlawful possession of a weapon without having a permit, N.J.S.A. 2C:39-5b (Count Four); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a (Count Five).
On May 27, 2004, the trial court conducted a Miranda[1] hearing, regarding the admissibility of defendant's January 9, 2003 oral statement, and determined that the statement was admissible.[2] On March 9, 2005, the State dismissed Count Three. On March 10, 2005, after the State informed the trial court that two of its witnesses, Shanelle Scales and her sister, Jasmine Scales, had no memory of the events of December 21, 2002, the court conducted a Gross[3] hearing regarding the admissibility of their prior inconsistent statements. Following the court's ruling that their prior statements were admissible, defendant was tried to a jury and convicted of all remaining charges.
On June 24, 2005, after the denial of his motions for a new trial and for judgment notwithstanding the verdict, defendant was sentenced on his conviction on Count Two, felony murder, to a thirty-year term of imprisonment with a thirty-year mandatory period of parole ineligibility. Defendant was sentenced on Count Four to a concurrent five-year term of imprisonment. Counts One and Five were merged with Count Two. All appropriate fines and penalties were imposed. Defendant appeals. We affirm the conviction on Count Four; and we reverse the convictions on Counts One, Two, and Five; and remand those counts to the trial court for re-trial.
On appeal, defendant argues:
POINT I.
THE TRIAL COURT DEPRIVED THE DEFENDANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF ATTEMPTED THEFT. (NOT RAISED BELOW).
POINT II.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE TRIAL COURT'S INSTRUCTION THAT PRECLUDED THE JURY FROM CONSIDERING THE AFFIRMATIVE DEFENSE TO FELONY MURDER. (NOT RAISED BELOW).
POINT III.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED *326 BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE MATERIAL MISREPRESENTATION OF A LEGAL STANDARD TO CONVICT A DEFENDANT OF ROBBERY AND FELONY MURDER. (NOT RAISED BELOW).
POINT IV.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE FAILURE TO INSTRUCT THE JURORS THAT THE DEFENDANT COULD NOT BE CONVICTED AS AN ACCOMPLICE TO ARMED ROBBERY AND FELONY MURDER IF THE ASSISTANCE OCCURRED AFTER THE PRINCIPAL HAD REACHED HIS POINT OF SAFETY. (NOT RAISED BELOW).
POINT V.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES[] CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE TRIAL COURT'S FAILURE TO EXPLAIN THE LAW IN THE CONTEXT OF THE FACTS OF THE CASE AFTER THE JURY ASKED FOR A RE-INSTRUCTION ON THE LAW. (NOT RAISED BELOW).
POINT VI.
THE ADMISSION OF EVIDENCE OF THE DEFENDANT'S PRE-ARREST SILENCE TO PROVE HIS GUILT VIOLATED THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE NEW JERSEY COMMON LAW. (NOT RAISED BELOW).
POINT VII.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED WHEN THE TRIAL COURT SHIFTED THE BURDEN TO THE DEFENDANT TO SHOW THAT HE DISAPPROVED OR OPPOSED THE ACTIONS LEADING TO THE DEATH OF THE VICTIM. (NOT RAISED BELOW).
POINT VIII.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED WHEN THE STATE'S LAY WITNESS PROFFERED HIGHLY PREJUDICIAL OPINIONS THAT SHOULD HAVE BEEN EXCLUDED. (NOT RAISED BELOW).
POINT IX.
THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND RIGHT TO CONFRONTATION AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 AND PAR. 10 OF THE NEW JERSEY CONSTITUTION WERE VIOLATED BY THE ADMISSION OF HEARSAY STATEMENTS AS SUBSTANTIVE EVIDENCE *327 IMPLICATING THE DEFENDANT.
POINT X.
THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD KNOWINGLY AND VOLUNTARILY WAIVED HIS MIRANDA RIGHTS.
POINT XI.
THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED.

I.
The following is a synopsis of the relevant evidence adduced at trial. In December 2002, Issach Powell resided at 45 Parker Street in Freehold with his family and co-defendant Davis. Defendant, whose nickname is "Irv Gotti," also occasionally resided at the Parker Street residence with Powell. On the night of December 20, 2002, defendant, Davis, Powell, and Zachary Butts spent a few hours at the home of Powell's girlfriend, Sharaya Handberry, in Freehold. While Powell stayed at Handberry's home, defendant, Davis, and Butts left the residence and walked toward the intersection of Marcy and Conover Streets.
Upon arriving at the intersection at approximately 1:45 a.m., Butts entered his house leaving defendant and Davis standing at the intersection. After about fifteen minutes, defendant and Davis saw Hernandez, who appeared "drunk," "stumbling" in a southerly direction on Conover Street and turning right onto Marcy Street.[4] Davis walked across Conover Street and followed Hernandez down Marcy Street for approximately 182 feet before tapping Hernandez on his shoulder. After Hernandez turned and swung at Davis, Davis pulled out a handgun and shot him. Davis and defendant immediately took off running up Marcy Street to Powell's home on Parker Street without taking any of Hernandez's belongings or money. Upon entering the residence, defendant called Powell and told him "it's going to be hot in Freehold."
Claudia Gastelum lived at the corner of Marcy and Parker Streets. At approximately 2:00 a.m. on the morning of December 21, 2002, Gastelum was "going to go out" when she "heard a popping sound." Although scared, Gastelum opened the door and saw two unidentified men running down Parker Street. As she stood by her opened door, the men ran by her house and stopped behind a parked car in front of 23 Parker Street.
At the same time that Gastelum observed the two men run by her home, Jasmine and Shanelle Scales, along with their friend Tamika Thurman, were on the front porch of their grandmother's home at 38 Parker Street, having arrived at the residence a short time prior, after an evening of drinking at the nearby Elks Club. While drinking on the porch, they heard a loud noise and observed two men they recognized as Davis and defendant running down the street toward Powell's house. As defendant and Davis passed their grandmother's porch, Jasmine heard defendant say to Davis "put it up, put it up." Shanelle heard defendant say to Davis, "yo, god hurry up and put that shit up."
At approximately 2:00 a.m. on the morning of the shooting, Sergeant Glen Roberts of the Freehold Borough Police Department was on patrol on Center Street handling *328 a noise complaint with Patrolmen Ciampa and Steppat. As they were about to clear the scene, the officers heard what sounded like a gunshot. They immediately proceeded to the area of Conover and Marcy Streets where they found Hernandez lying on his back, warm to the touch, but without a pulse. A spent nine-millimeter bullet casing was found about three feet from Hernandez. During his examination of Hernandez's body, Roberts found Hernandez's wallet intact and did not find any indication that "anything had been removed" from the victim. While the Freehold Borough police officers were still at the scene, Detective Brian Veprek of the Monmouth County Prosecutor's Office arrived and assumed control of the investigation. After examining the crime scene, Veprek secured the nine-millimeter casing.
Powell returned to his Parker Street residence at 7:00 a.m. on December 21, 2002, where he found Davis and defendant sleeping. At approximately 8:00 a.m. Powell and defendant began walking to a store on South Street when they were stopped by Veprek and other detectives, who were canvassing the neighborhood in an attempt to locate witnesses. Defendant and Powell were questioned separately, with Veprek questioning defendant.
Veprek identified himself and informed defendant that he was investigating a homicide that had occurred earlier that morning. Defendant, in turn, identified himself, giving Veprek his name and his address as Powell's residence. Defendant was then asked where he had been the night before, whether he had any weapons on his person, and whether he had shot anyone. Defendant denied any involvement in the shooting or having knowledge about the shooting until then. Defendant informed Veprek that he had been with Davis the night before at the Freehold Raceway Mall before returning to Powell's house at midnight.
Veprek's next involvement with defendant was on December 22, 2002, when Veprek sought him out for further questioning. The interview occurred at the Monmouth County Correctional Institution, where defendant was incarcerated on a charge unrelated to the shooting. After Veprek informed defendant of his Miranda rights, defendant provided an eleven-page statement. Defendant, eighteen years of age at the time of the incident, told Veprek that: 1) he had learned of the shooting at around 2:30 a.m. on December 21, 2002, from Powell's aunt, Debbie Powell, who showed up at Powell's house, stating that there was a shooting "up the street" and asking where Powell was; 2) he had telephoned Powell at Handberry's house, but there was no answer; and 3) he had gone to sleep after failing to reach Powell, waking up at about 6:30 a.m.
In his statement defendant provided detailed information about his whereabouts from Friday, December 20, 2002, to 2:30 a.m. on Saturday, December 21, 2002. Defendant explained that he played videogames with Powell and Davis until 8:00 p.m., after which they took a taxi to the Freehold Raceway Mall, and attended a movie. After the movie ended, at around 11:30 p.m., they took a taxi back to Powell's house and went to sleep. Powell left the house at around 12:30 a.m. and called defendant at 1:40 a.m. to say that he was at Handberry's house. Defendant went back to sleep until he was awakened by Powell's aunt asking where Powell was. Powell came home at around 6:00 a.m., and defendant woke up at 6:30 a.m. After defendant and Powell left the residence to go to a store, they were stopped and questioned on the street by the police. Defendant denied discussing the shooting with Powell, being involved in the shooting, *329 knowing who had committed the shooting, owning a handgun, or being aware that Powell or Davis owned a handgun.
On January 9, 2003, Detectives Douglas Johnson and Michael Meany of the Monmouth County Prosecutor's Office proceeded to the Scales' residence at 38 Parker Street, having previously been told that Shanelle and Jasmine possessed information concerning the shooting. At the request of the detectives, the sisters accompanied them back to the Monmouth County Prosecutor's Office where they provided written statements, setting forth their knowledge of the events they witnessed and overheard on December 21, 2002. Also on January 9, 2003, Detective Gary Friedhoff and fourteen other police officers executed a search warrant at Powell's residence. During the search, the police secured the individuals in the residence, including defendant, Davis, and Powell.
While searching the outside of the residence, Friedhoff noticed "a black shaving bag on top of, by the roof, like half in the gutter and on the roof." Friedhoff reached up and knocked the bag off the roof. The bag fell about eight-and-one-half feet, making a loud noise as if "something was very large inside that bag." Friedhoff opened the bag, finding a brown cotton bandanna wrapped around a fully loaded and operable nine millimeter handgun. Defendant, Davis, and Powell were arrested for unlawful possession of a handgun. No fingerprints were found on the gun, the bag, or on the ammunition removed from the gun.
After his arrest, defendant was brought to the prosecutor's office and given his Miranda rights. Veprek told defendant that no records existed of any taxis transporting anyone from 45 Parker Street to the Freehold Raceway Mall and back on the evening prior to the shooting. Veprek also told defendant that his fingerprints had been found on the gun recovered during the search of Powell's residence.
At that point, defendant told Veprek that Davis had shot the victim and that:
the Mexican was stumbling down Conover toward Marcy. Made a right onto Marcy. [Davis] followed the Mexican down Marcy and I was behind him. [Davis] was going to rip the Mexican. [Davis] had tapped on the Mexican's shoulder and the Mexican swung at [Davis] and [Davis] shot him with the black 9.
Defendant claimed he "just knew" that Davis was going to "rip the Mexican." However, defendant did not answer when Veprek asked if he was going to "rip the Mexican" with Davis. Defendant explained that the victim was drunk and that "rip" meant "rob." Defendant stated that he was standing approximately six feet away from Davis when Davis shot the victim, and that they both immediately took off running up Marcy Street to Powell's house. After arriving at the residence, defendant called Powell and told him that it "was going to be hot in Freehold."
Before Veprek was able to obtain a formal statement from defendant, defendant's mother retained an attorney who requested that Veprek stop questioning defendant. The interview ceased, and defendant was transported to the Freehold Police Department to be processed. Veprek memorialized his conversation with defendant, first in notes taken during the interview and again in a supplementary investigation report dated February 21, 2003, which Veprek prepared from his interview notes.
On January 13, 2003, while defendant was in custody, Veprek received a message from him "requesting to talk to investigators." *330 Defendant and his attorney met with Veprek the next day, January 14th, and defendant provided an eighteen-page statement describing what happened at approximately 2:13 a.m. on December 21, 2002:
I was coming from the Rug Mill around 1:30 in the morning a.m. I was with Zachary Butts and Gregory Davis. We walked from Jackson to Mechanic to Conover. We stopped on the corner of Marcy. Zachary Butts entered his house around 1:40, 1:45. Me and Gregory Davis waited on the corner of Marcy just for a little stop. In that process a car stopped, asked us if we knew where they could find any women and we said no. After that, the car drove off. About 15 minutes later a Mexican came up Conover walking in the same direction on the other side, stopped at the corner, made a right onto Marcy, heading towards South Street. [Davis] walked across Conover to the other part of Marcy. Walked up to the guy and as he did that I followed and I stopped in front of the white house on Marcy Street. [Davis] tapped the guy on the shoulder and in defense I guess the guy swung in the direction of [Davis]. [Davis] reached in his pocket, pointed the gun and fired it at the guy. The guy fell. I started running toward the second part of Marcy. Made a right on Parker and ended up at 45 Parker. [Davis] followed.
Defendant told Veprek that there was no conversation between him and Davis after they saw Hernandez stumbling down the street; he did not ask Davis what he was doing when he started to follow the man; and neither he nor Davis said anything to the victim. Although defendant first denied any knowledge of what Davis was going to do when he followed Hernandez, he later stated that he "assume[d]" Davis was going to "rip," or rob, the victim.
In this statement, defendant explained that he was about fifteen to sixteen feet away from Davis when Davis shot Hernandez. Defendant stated that the first time he saw Davis with a gun on December 21, 2002, was at the time of the shooting when Davis tapped the victim with his left hand and shot him with his right hand. After Hernandez was shot, neither he nor Davis took anything from the victim. Defendant denied having any conversation with Davis while they were running to Powell's house; he specifically denied saying "yo, god, hurry up and put that shit up."
After arriving at Powell's house, defendant and Davis went to sleep. Defendant claimed that he did not know where the gun was and denied having "any conversations" about the incident with Davis after the shooting. Defendant called Powell that night and told him that it was going "to be hot in Freehold." Defendant stated that he informed Powell about the shooting because Davis had "told him first." According to defendant, Davis told Powell that "he caught a body," which meant he had killed someone. At first, defendant denied knowing who owned the gun. However, later during the interview, he stated that he first saw the gun on December 7, 2002, and he had occasionally seen the same gun in the possession of Powell and Davis. Defendant denied ever possessing, touching, or putting bullets in the handgun. Eventually, defendant told Veprek that he had "touched" the gun one time when he saw it in a dresser in Powell's bedroom. He said that he did not tell police that Davis had shot Hernandez because of the "code of the street."
At trial, because defendant chose not to testify and the State did not call Davis as a witness, the State introduced evidence of the facts pertaining to the robbery primarily *331 through testimonies of Claudia Gastelum; Detective Veprek, who testified as to defendant's oral and written statements; Powell, who testified as to defendant's statements and his knowledge of the handgun used by Davis to shoot Hernandez during the robbery; and Shanelle and Jasmine Scales. Prior to jury selection, the court conducted a Gross hearing to determine the admissibility of Shanelle and Jasmine's prior statements. Testifying at the hearing were the two sisters, and Detectives Johnson and Meany.
Shanelle testified that she did not recall giving the detectives a formal statement on January 9, 2003. Specifically, she denied being asked about hearing a noise on the morning of December 21, 2002, which sounded like a "firecracker." Nor did she remember telling the detectives that she heard defendant say "put that shit up." Although Shanelle acknowledged that it was her signature on the formal statement presented to her during the hearing, she did not remember providing the statement, signing it, or swearing to the truth of its contents. She testified that she had known Davis for more than ten years and had only known defendant under the name of "Irv Gotti" for "possibl[y]" more than a week, but she was not sure if it was for more than a month. Shanelle testified that the reason she had no independent recollection of the events that occurred on the morning of the shooting was that she, her sister, and her friend were all intoxicated when they got back to her grandmother's house. The investigators never asked her if she was under the influence of any drugs or alcohol on either the date of the shooting or on the date of her statement.
Jasmine testified that she did not remember what the investigators had asked her, what happened when she got to the prosecutor's office on January 9, 2003, or what she said in her statement. She only remembered that she was there. At first, she testified that she did not "actually remember" being questioned, but then she responded in the affirmative when asked if someone was typing the statement as she gave it, whether the detective was asking questions, and whether she had an opportunity afterwards to review her statement. Although Jasmine did not remember if she made any corrections to the statement, she did acknowledge her signature and initials on it.
Like Shanelle, Jasmine did not recall telling the detectives on January 9, 2003, that she heard a noise that sounded like a firecracker, seeing two men running down the street toward Powell's house, or hearing defendant, whom she identified as Gotti, saying "put it up." Although Jasmine had described the person she knew as Gotti in her statement, she claimed at the hearing that she neither knew Gotti nor had ever seen him either before or on December 21, 2002.
Jasmine stated that she did not recall the events of December 21, 2002, because she was intoxicated, and that she did not remember giving a statement on January 9, 2003, because she was "under the influence" of marijuana at the time. She claimed that she was not asked whether she was intoxicated on December 21, 2002, nor whether she was under the influence of anything on January 9, 2003.
Detectives Johnson and Meany testified that they went to Parker Street on January 9, 2003, to "find some witnesses" to the shooting, and had been told that the "Scales sisters" witnessed the shooting. The detectives spoke to Shanelle and Jasmine, and after learning that they had "information," transported them to the prosecutor's office for questioning.
Johnson conducted an informal interview before taking a formal statement *332 from Shanelle, who he described as "cooperative," "very much coherent[,] and lucid." The statement consisted of the detective's questions and Shanelle's responses, which were "taken down verbatim." Shanelle then read the typed statement, made one correction, initialed the correction, and certified "as to the authenticity or veracity of the statement." Johnson admitted that he had not asked Shanelle whether she had been drinking on the night of the shooting or whether she was "under the influence" on the date of the statement. However, he stated that "[s]he never acted like she didn't recall or was having problems recalling. She very vividly answered each question after [it was asked]."
Meany and another detective interviewed Jasmine and then took a formal statement from her. The statement consisted of questions and Jasmine's verbatim answers. Jasmine reviewed the typed statement, added a handwritten sentence on page three that she believed "Irv Gotti" was from Irvington, and then she signed and certified to the veracity of the statement. Meany testified that Jasmine "appeared normal" when she gave her statement. Meany admitted that he had not asked Jasmine whether she had been drinking or using drugs on either December 21, 2002, or on January 9, 2003.
At the conclusion of the hearing, the trial judge determined that Shanelle and Jasmine were "feigning the lack of recall," and he did not believe either of their testimonies. The judge ruled that the prior statements were "reliably given at the time" and permitted their introduction.
At the time of trial, Powell was incarcerated awaiting trial on unrelated charges of aggravated assault with a weapon, first-degree robbery, and weapons charges. Powell testified that early in the morning of December 21, 2002, while he was at Handberry's home, he received a telephone call from defendant, wherein defendant told him that "Freehold was about to get hot."
Later in the day, Powell talked to defendant and Davis regarding the shooting on Marcy Street. Powell testified that while Davis had only told him that he had "shot somebody," defendant had told him the "story." According to Powell, defendant told him that: 1) he and Davis were on the corner and Davis had run the guy down; 2) he heard Davis say "give me the money"; 3) the "dude had swung at [Davis] and that's when [Davis] shot him"; and 4) as soon as defendant heard the shot, he ran. Powell stated that neither defendant nor Davis told him of any prior "discussion about [defendant] helping [Davis] do anything" and that he had no "information to suggest that [defendant] knew what [Davis] was doing" before the shooting occurred.
Powell also testified concerning the weapon used during the robbery. Powell stated that when he heard about the shooting he assumed that the gun used was the one that "me and [Davis] had." Powell identified a picture of the gun seized during the search of his home on January 9, 2003, and the black bag in which the gun was found. According to Powell, the gun was "usually" shared by him and Davis, and was generally hidden in an abandoned house up the street. However, any one of his friends, including defendant, "that needed it" for protection also used it.
Initially, Powell testified that although defendant knew about the gun, Powell had never seen defendant with "actual possession" of the gun. However, when confronted with a prior statement, Powell recalled telling the police that he had seen defendant and Davis with the gun "when we was like just walking around Freehold" and defendant then "gave it to [Butts] *333 because he said he was going to Asbury." However, Powell did not recall the date of that occurrence.

II.
Because the arguments raised in Points I through VIII of defendant's brief were not raised below, we consider them under the plain error rule. R. 2:10-2. A reviewing court will reverse on the basis of an unchallenged error, only if the error was "clearly capable of producing an unjust result." Ibid.; State v. Castagna, 187 N.J. 293, 312, 901 A.2d 363 (2006); State v. Macon, 57 N.J. 325, 337, 273 A.2d 1 (1971). To reverse for plain error, the reviewing court must determine that there is a real possibility that the error led to an unjust result, that is, "one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Macon, supra, 57 N.J. at 336, 273 A.2d 1.

III.
Defendant argues in Point III that he was denied due process because of the prosecutor's "material misrepresentation" during his summation "of the legal standard to convict a defendant of robbery and felony murder." Defendant contends that it was reversible error for the prosecutor to have told the jury that it could find him guilty of felony murder if he had just "assisted the principal in concealing the evidence of the crime."
In Point IV defendant argues that the trial court erred by failing to instruct the jury that he "could not be convicted as an accomplice to armed robbery and felony murder if the assistance occurred after the principal had reached his point of safety." Defendant also contends that the court should have provided a curative instruction on what constitutes "in the course of committing or attempting to commit a theft" for the jury to determine whether there was criminal liability for robbery.
"It is well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations." State v. Williams, 113 N.J. 393, 447, 550 A.2d 1172 (1988). This wide latitude is not unfettered, however; it is bound by parameters established by decisional law and by ethical considerations. Ibid.
Proper jury instructions "are essential to a fair trial." State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981). The court must give the jury "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Id. at 287-88, 430 A.2d 914. The jury charge should include instruction on all "essential and fundamental issues and those dealing with substantially material points." Id. at 290, 430 A.2d 914. "However, a defendant is not entitled to have the jury instructed in his [or her] own words." State v. Pleasant, 313 N.J.Super. 325, 333, 712 A.2d 1215 (App.Div.1998), aff'd, 158 N.J. 149, 728 A.2d 223 (1999).
In assessing the propriety of the jury charge, we examine the entire charge to see whether it was ambiguous or misleading or whether it misinformed the jury of the law. State v. R.B., 183 N.J. 308, 324, 873 A.2d 511 (2005). Generally, except for plain error, under Rule 1:7-2, a defendant waives the right to contest an instruction on appeal "if he does not object to the instruction." State v. Torres, 183 N.J. 554, 564, 874 A.2d 1084 (2005). When a jury instruction follows the model jury charge, although not determinative, "it is a persuasive argument in favor of the charge as delivered." State v. Angoy, 329 N.J.Super. 79, 84, 746 A.2d 1046 (App.Div.), certif. *334 denied, 165 N.J. 138, 754 A.2d 1214 (2000). However, because of their importance in the trial proceeding, "`erroneous instructions on material issues are presumed to be reversible error.'" State v. Lopez, 187 N.J. 91, 101, 900 A.2d 779 (2006) (quoting State v. Marshall, 173 N.J. 343, 359, 801 A.2d 1142 (2002)).
Defendant objects to the following portion of the prosecutor's summation:
But what I do know or you should know beyond a reasonable doubt, that that gun is up there on January the 9th, during the raid, and you do know that the Scales sisters are hearing [defendant] say to Greg Davis "yo, god, put it up, put it up."
Does it mean put it up under the gutter? Does it mean hide it? Who knows what it means.
But you know what it isand this is real importantit's an instruction. He's telling him to do something. And this becomes real important. Because I've never said and there's no proof that [defendant] is the shooter in this case. He's the accomplice. He's the aider. He encourages. He assists and by telling Greg Davis, ["]yo, you got to put it up. Yo, you got to put it up. Put that shit up.["] That is some sort of instruction for what I submit to you is to do something with the gun.
You can make that inference. Whether it means put it on the gutter. Whether it means do something else. I can't say for sure.
But it is an instruction and that I can say for sure.
Defendant also objects to the prosecutor's comments describing his role as an accomplice:
And an act shall be deemed to be included in the phrase in the course of committing a theft if it occurs in an attempt to commit the theft or in immediate flight after the attempt of commission.
Now, this is important.
An attempt of a theft with force is a robbery. Even if that theft is never completed.
So all this stuff about his wallet on him, his keys on him, his money. Doesn't matter. As long as you find that there's a valid attempt. You have the valid attempt because Ike Powell's version of what [defendant] told him said something about how [Davis] ran down on the dude, said something to the effect of give me your money. You have [defendant] saying he taps him on the shoulder and then he swings at him. So you have the attempt. But more importantly a robbery is a continuous event. Okay.
And it means that if you aid someone during the immediate flight from a robbery, you essentially have committed a robbery.
And I can give you an example of this.
Let's say that you're driving your car and you pick up a hitchhiker. And the hitchhiker gets in your car and says, hey, I just did a robbery. Could you take me to the airport so that they don't catch me and you say, okay, I agree to that. Take the person to the airport. Is that hindering apprehension? No. That is a robbery right there.
[(emphasis added).]
During the course of the armed robbery charge, the trial court instructed the jury that the State had argued that defendant "knew of the armed robbery and during the actual attempted theft or [in the] immediate flight [therefrom], purposely aided Greg Davis and, therefore, should be guilty as an accomplice to armed robbery." The court then explained that "an act is considered to be ... `in the course of committing a theft' if it occurs in an attempt *335 to commit the theft, during the commission of the theft itself, or in immediate flight after the attempt or commission."
We do not determine that the prosecutor intentionally misstated the law of robbery as it applies to accomplice liability. The prosecutor argued in good faith based on his interpretation of prior cases. Nor do we fault the trial court in failing to provide curative or limiting instructions because of the failure of defendant to object to the prosecution's comments. However, we agree with defendant that the State's argument to the jury, as bolstered by the trial court's instructions, requires reversal as plain error. R. 2:10-2.
In reaching our conclusion, we travel a different path than that taken by defendant. The "critical issue" is not whether defendant uttered the "instruction" to Davis after they arrived back at Powell's house, but whether all the elements of the crime of robbery had been concluded before defendant provided his oral instruction. We begin our analysis by looking to the statutes governing accomplice liability and robbery.
The accomplice liability statute provides in pertinent part:
a. A person is guilty of an offense if it is committed ... by the conduct of another person for which he is legally accountable....
b. A person is legally accountable for the conduct of another person when:
....
(3) He is an accomplice of such other person in the commission of an offense;
....
c. A person is an accomplice of another person in the commission of an offense if:

(1) With the purpose of promoting or facilitating the commission of the offense; he

(a) Solicits such other person to commit it;
(b) Aids or agrees or attempts to aid such other person in planning or committing it; or
(c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do....
[N.J.S.A. 2C:2-6 (emphasis added).]
Under the statute, "`an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice.'" State v. Weeks, 107 N.J. 396, 401, 526 A.2d 1077 (1987) (quoting State v. White, 98 N.J. 122, 128, 484 A.2d 691 (1984)).
For a defendant to be convicted of a crime based on accomplice liability, he or she must have shared the same criminal intent to commit the substantive offense as the principal. White, supra, 98 N.J. at 129, 484 A.2d 691; State v. Cook, 300 N.J.Super. 476, 486, 693 A.2d 483 (1996). Therefore,
[a]n accomplice may be guilty of armed robbery even though he did not personally possess or use the firearm in the course of the commission of the robbery. The accomplice has committed the same crime as the individual who possessed or used the gun if the accomplice had the purpose to promote or facilitate that crime, namely, robbery with the use of a firearm.
[White, supra, 98 N.J. at 130, 484 A.2d 691.]
"However, each participant in a crime is guilty only to the degree of his [or her] own intent." Cook, supra, 300 N.J.Super. at 486, 693 A.2d 483. Accordingly, "[i]t is possible for an accomplice to be guilty *336 of robbery and for his compatriot to be guilty of armed robbery." White, supra, 98 N.J. at 131, 484 A.2d 691.
Here, defendant was found guilty of robbery, which was elevated to first degree, because Davis was not only armed with, but used a deadly weapon in the course of an attempted theft. N.J.S.A. 2C:15-1b. Because of the serious consequences that flow from a conviction of robbery, particularly when used as a springboard for a conviction of felony murder, N.J.S.A. 2C:11-3a(3), the trial court was "`obligated to provide the jury with accurate and understandable jury instructions regarding accomplice liability even without a request by defense counsel.'" Cook, supra, 300 N.J.Super. at 486, 693 A.2d 483 (quoting State v. Bielkiewicz, 267 N.J.Super. 520, 527, 632 A.2d 277 (App.Div.1993)).
The State presented its case of accomplice liability against defendant under two alternate theories. First, that defendant aided Davis in the crime of robbery by promoting or facilitating the actual commission of attempted theft, while knowing Davis was armed. On this prong of the State's case, we are satisfied that the evidence presented a jury question as to defendant's guilt. Defendant's actions in following Davis and Hernandez down Marcy Street, and his presence at the scene of the robbery, without evidence of his disapproval of Davis's intention to "rip" or "rob" Hernandez, were factors or circumstances on which the jury could have inferred that defendant approved of and aided in the robbery.[5] However, it is the second prong of the State's case of accomplice liability that causes us to reverse.
The State argued in the alternative that the jury could find defendant guilty of robbery, and thereby guilty of felony murder, based solely on defendant's "instruction" to Davis to "put it up" or words to that effect  meaning to hide the gun. The State argued to the jury that this instruction, made while fleeing from the place of the attempted theft, could be used as an independent basis to find defendant guilty of robbery. We disagree.
To determine the validity of the argument we turn to the statutory definition of robbery. Pursuant to N.J.S.A. 2C:15-1a:
A person is guilty of robbery if, in the course of committing a theft, he:
(1) Inflicts bodily injury or uses force upon another; or
(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
(3) Commits or threatens immediately to commit any crime of the first or second degree.
An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.
The State argues on appeal, as it argued to the jury, that defendant's instruction constituted aiding in the commission of the crime of robbery, because robbery is an ongoing offense and by definition continues during the flight from an attempted theft, citing N.J.S.A. 2C:15-1a. The State contends that defendant's instruction to Davis was an "act" made "in immediate flight *337 after the attempt[ed]" theft, and as such, is recognized by the statute to "be deemed to be included in the phrase `in the course of committing a theft.'" The State asserts that if the instruction is deemed to have occurred "in the course of committing a theft," N.J.S.A. 2C:15-1a, then defendant may also be found guilty of the robbery as an accomplice if the jury determines the instruction constituted aiding or attempting to aid Davis in the commission of the attempted theft. N.J.S.A. 2C:2-6.
To accept the State's argument, we are required to determine that the phrase "[a]n act shall be deemed to be included in the phrase `in the course of committing a theft,'" N.J.S.A. 2C:15-1a, includes acts other than those contained in sections a(1), (2), and (3) of the robbery statute, which elevate simple theft, or attempted theft, to the crime of robbery. We do not read N.J.S.A. 2C:15-1a so broadly. We construe that phrase of the robbery statute as referring only to the defined acts contained in N.J.S.A. 2C:15-1(a)(1), (2), and (3), which may occur during the theft or attempted theft, or during the flight therefrom. In reaching our decision we find the following cases instructive: Lopez, supra, 187 N.J. 91, 900 A.2d 779; State v. Mirault, 92 N.J. 492, 457 A.2d 455 (1983); and State v. Carlos, 187 N.J.Super. 406, 455 A.2d 89 (App.Div.1982), certif. denied, 93 N.J. 297, 460 A.2d 693 (1983). We address the cases in chronological order.
In Carlos, the defendant in a single incident, threatened four individuals with a handgun but only committed theft or attempted theft from two of the victims. The defendant was convicted of four counts of first-degree robbery, one count of aggravated assault, one count of attempted aggravated assault, and a weapon offense. Carlos, supra, 187 N.J.Super. at 410, 455 A.2d 89. On appeal, we addressed the question of "whether two or four robberies have been committed when a robber obtains money from two victims in the presence of two additional persons after threatening the four of them with a gun." Id. at 409, 455 A.2d 89.
We answered the question by holding "that each conviction for robbery must involve a theft or attempted theft from the possession or custodial care of the same person who is intimidated, threatened or injured." Id. at 416, 455 A.2d 89. In reaching our decision we defined the elements of robbery as:
(1) theft or attempted theft; (2) intimidating or assaultive conduct consisting of (a) inflicting bodily injury upon another or (b) threatening another with or purposely putting him in fear of immediate bodily injury or (c) committing or threatening immediately to commit any crime of first or second degree; (3) the intimidating or assaultive conduct must have occurred during the theft or attempted theft or in immediate flight after the theft or attempted theft, and (4) defendant must have acted purposely.
[Id. at 412, 455 A.2d 89 (footnote omitted and emphasis added).]
We continued and compared the differences in the elements of the crime of robbery under the New Jersey Code of Criminal Justice (the Code) and pre-Code.
The predecessor to N.J.S.A. 2C:15-1, N.J.S.A. 2A:141-1, generally required the force or intimidation to precede or become concomitant with the larceny. State v. Culver, 109 N.J.Super. 108, 262 A.2d 422 (App.Div.1970). Our present statutory law requires consideration of the offender's conduct not only during a theft or attempted theft, but also during immediate flight after a theft or attempted theft.

The apparent rationale for including conduct involved in immediate flight in the present law is the offender's willingness *338 to use force against those who would restrain him in flight. This willingness creates a compelling inference that the offender would have used force to commit the theft or attempted theft had there been need for it.

[Id. at 413, 455 A.2d 89 (emphasis added).]
In Mirault, the defendant broke into a house and stole personal property of the homeowner. On arriving home, the victim noticed that the front door was open and summoned the police. On entering the home, a violent struggle ensued between the investigating police officer and the defendant. Following a jury trial, the defendant was convicted of burglary, robbery, and aggravated assault of the officer. Mirault, supra, 92 N.J. at 494, 457 A.2d 455. On appeal, the defendant argued that the Legislature did not intend enhanced punishment under the robbery statute to apply "where a thief uses force against an arresting police officer." Id. at 498, 457 A.2d 455. We affirmed. Id. at 495, 457 A.2d 455.
The Court granted certification and affirmed. Id. at 494, 457 A.2d 455. In its decision, the Court noted that the Code broadened common law robbery.[6]Id. at 496, 457 A.2d 455. The Court also spoke to the element of injury or threat thereof under the former statute and the Code:
Our pre-code statute defined robbery as taking a person's property "by violence or putting him in fear." N.J.S.A. 2A:141-1. In contrast, the Code imposes liability for injury or threat to "another" before, during, and after a theft. N.J.S.A. 2C:15-1a. It is manifestly broader than the prior statute. The expansion of the definition expresses the Code's intent to focus on the felon's conduct and not the victim's status.
[Id. at 498, 457 A.2d 455 (emphasis added).]
The Court also rejected the defendant's argument that the theft was complete when he engaged in the struggle with the police officer. Id. at 500, 457 A.2d 455. The Court noted that N.J.S.A. 2C:15-1a now includes the phrase "in the course of committing a theft," which itself includes "both the attempt before and immediate flight after the theft." Ibid. The Court compared the language in the felony murder statute, N.J.S.A. 2C:11-3a(3), and determined that the struggle had occurred before the defendant had "reached a point of at least temporary safety." In doing so, it found that the assault and theft were "part of a continuous transaction." Id. at 501, 457 A.2d 455.
In Lopez, the defendant was convicted of robbery and second-degree reckless manslaughter after the trial court instructed the jury that "the intent to commit a theft may be formed either before the use of force or after, so long as the theft and the use of force could be considered to constitute a single transaction." Lopez, supra, 187 N.J. at 91, 900 A.2d 779. The Court accepted the defendant's argument that the robbery statute did not encompass "afterthought robbery," determining that "intimidating or assaultive conduct that is unrelated to a theft cannot elevate the theft to robbery." Id. at 98, 900 A.2d 779. In reversing the robbery conviction, the *339 Court addressed the issue of when the injury or threat of injury must occur:
[O]ur statute requires that the threats or violence be carried out in furtherance of the intention to commit a theft. Indeed, the sequence of events is critical; the intention to steal must precede or be coterminous with the use of force. That is why a person who has stolen goods and thereafter uses violence in flight is guilty of robberythe intention to commit the theft generated the violence. That model simply does not work where a violent fracas occurs for reasons other than theft, and the perpetrator later happens to take property from the victim. In the former example, the theft is the reason for the violence and a robbery has occurred. In the latter, the violence and the theft are unconnected, and the perpetrator is guilty of assault and theft but not of robbery.
[Id. at 101, 900 A.2d 779 (emphasis added).]
A common thread running through Carlos, Mirault, and Lopez is that the "act of causing the injury," or "the threat to cause the injury," is what has to occur "during the course of" the theft or attempted theft, or in the immediate flight therefrom, to elevate theft or attempted theft to robbery.
An example of our construction of the phrase contained in the robbery statute may be found in State v. McClary, 252 N.J.Super. 222, 599 A.2d 600 (App.Div. 1991), certif. denied, 130 N.J. 6, 611 A.2d 646 (1992). There, the defendant was found rummaging through an employee's purse in an office. When confronted by several employees, a struggle ensued with the defendant brandishing a knife. Defendant was convicted of first-degree armed robbery and weapon offenses. Id. at 224, 599 A.2d 600. In affirming the trial court's refusal to charge the crime of theft as a lesser-included offense, we noted that the Code broadened the concept of robbery by including within the "phrase `in the course of committing a theft' both the attempt before and immediate flight after the theft." Id. at 227, 599 A.2d 600. We determined that the defendant's actions of threatening the employees with the knife occurred during the immediate flight after the theft. Id. at 228, 599 A.2d 600.
In reaching our conclusion herein, we were also informed by the decision in People v. Dennis, 181 Ill.2d 87, 229 Ill.Dec. 552, 692 N.E.2d 325 (1998). In Dennis, the defendant drove his motor vehicle into an alleyway and blocked the truck the victims were in. While stopped, co-defendant Earnest Jones, exited the vehicle with a gun and robbed two victims. Id. at 328. Defendant was charged with armed robbery, 720 ILCS 5/18-2(a), on the theory of accountability, 720 ILCS 5/5-2.[7]Id. at 327.
At trial, the defendant admitted driving his motor vehicle into the alleyway, but *340 denied involvement in the robbery. The defendant claimed that he had driven there with his fiancée and Jones, with the intent of purchasing heroin at a drug house. Id. at 328. After he dropped Jones off to buy the drugs, the defendant turned his vehicle around in the alleyway. Jones returned to the car and told the defendant to go. Ibid. The defendant stated he was not aware that Jones had committed a robbery; rather he thought there had been a drug bust. On driving away, the defendant noticed for the first time that Jones had a handgun and was carrying a stolen radio. Id. at 328-29.
During jury deliberations, the jury asked "`[w]hen is the commission of the offense complete?'" The trial court responded that the jury could consider "`the period of time and activities involved in escaping to a place of safety.'" Id. at 329. The appellate court reversed, determining that the crime of robbery ended when the victims gave up their property, and the trial court should have so instructed the jury. Ibid.
The Illinois Supreme Court affirmed, concluding that for the purpose of accountability under the Illinois statute, the duration of the commission of an offense is defined by the elements of the offense. Id. at 333. The Court then determined that under the Illinois robbery statute,
[n]either flight from pursuing victims nor escape are included as elements in the statutory definition of robbery. Thus ... the offense of armed robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will. Although the force which occurs simultaneously with flight or an escape may be viewed as continuing the commission of the offense it is the force, not escape, which is the essence and constitutes an element of the offense. The commission of an armed robbery ends when force and taking, the elements which constitute the offense, have ceased.
[Id. at 334 (internal citations omitted).]
The State cites State v. Williams, 232 N.J.Super. 432, 557 A.2d 675 (App.Div.), certif. denied, 118 N.J. 208, 570 A.2d 967 (1989) and State v. Baker, 303 N.J.Super. 411, 697 A.2d 145 (App.Div.), certif. denied, 151 N.J. 470, 700 A.2d 882 (1997) in support of its argument that the phrase "[a]n act shall be deemed to be included in the phrase `in the course of committing a theft,'" N.J.S.A. 2C:15-1a, encompasses defendant's instruction to Davis while they were fleeing from the crime scene. We conclude that Williams and Baker lend little support to the State's argument.
In Williams, the defendant had driven two individuals to a place where they stepped from the car, flashed a simulated handgun and took a radio from a third party. After the theft, the two perpetrators got back into the car, and the defendant drove them from the scene. The defendant was charged with first-degree robbery and terroristic threats. Williams, supra, 232 N.J.Super. at 433, 557 A.2d 675. The defendant and one of the two co-defendants testified at trial that the defendant did not know that the co-defendants had intended to rob the victim when he stopped the car to let them out. Ibid.
The trial court charged the jury on accomplice liability and denied defendant's request to charge the crime of hindering apprehension, N.J.S.A. 2C:29-3, as a lesser-included offense of the crime of robbery. On appeal this court affirmed, determining that hindering apprehension was not a lesser-included offense of robbery. Id. at 436-37, 557 A.2d 675. In reaching its decision, the court concluded that "under the Code a robbery is not completed by the taking of property by force, but continues into the immediate flight after *341 such an act." Id. at 436, 557 A.2d 675. The court determined that the "defendant's conduct occurred `in the course of a theft' because the robbery was ongoing and in progress." Ibid.
The panel in Williams relied on the case of Williams v. United States, 478 A.2d 1101 (D.C.1984), where the District of Columbia Court of Appeals held that it is "inappropriate to convict [the] driver of [the] getaway vehicle as [an] accessory after the fact for armed robbery in light of `the continuing nature of the crimes of robbery during the asportation of the goods.'" Williams, supra, 232 N.J.Super. at 436, 557 A.2d 675 (quoting Williams, supra, 478 A.2d at 1105). However, we find the panel's reliance on the District of Columbia case misplaced. Asportation, or the carrying away of the property of another, is not an element of the crime of robbery under the Code. Mirault, supra, 92 N.J. at 496, 457 A.2d 455. And merely asporting the goods is readily distinguishable from committing violence or intimidation during the "immediate flight" after a theft. Again, to constitute an element of robbery, the acts occurring during that flight must be those described in N.J.S.A. 2C:15-1a(1), (2) or (3).
In Baker, the defendant drove three co-defendants to a drug dealer. After locating the drug dealer, the three co-defendants left the vehicle, robbed the drug dealer and returned to the defendant's vehicle. In the course of the robbery, one of the co-defendants shot the drug dealer. After learning of the shooting, the defendant drove the three co-defendants from the scene. The defendant was charged with first-degree robbery as an accomplice and with conspiracy to commit armed robbery. Baker, supra, 303 N.J.Super. at 413, 697 A.2d 145. At trial, the defendant and two co-defendants testified that the defendant had thought that he was driving the co-defendants to buy drugs and had no knowledge that the three passengers had planned the robbery or had possession of the gun until they returned to the vehicle. The defendant was convicted of both charges.
On appeal, the defendant argued that the standard charge, that an act is considered to be in the course of committing a theft if it occurs during the immediate flight of the theft, implicitly authorized the jury to find him guilty of robbery as an accomplice even if the jury believed his testimony. This court affirmed, id. at 416, 697 A.2d 145, citing Williams, supra, 232 N.J.Super. 432, 557 A.2d 675. The panel in Baker held "[t]he literal meaning of the statute is that the `immediate flight after the attempt or commission' is included in `robbery' as defined by N.J.S.A. 2C:15-1." Ibid. This is inconsistent with our construction of the statute, under which only acts of violence or intimidation committed during flight are included in the definition.
Baker also relied on People v. Turner, 120 Mich.App. 23, 328 N.W.2d 5 (1982). In Turner, the defendant was convicted of robbery after she was found in the passenger's seat of the getaway vehicle, hiding on her person a portion of the money taken during the robbery. The defendant claimed that she could only be guilty as an accessory after the fact because the robbery had been completed before the escape. Turner, supra, 328 N.W.2d at 6. Although the crime of robbery is defined under Michigan law as including the element of asportation, ibid., the court found all the elements of the crime complete before the defendant had reached a point of safety, because asportation did not require a complete escape with the stolen money, only a slight movement thereof. The court determined that robbery was an ongoing offense, and the offense continued during the escape. Ibid. However, five *342 years after Baker, Turner was overruled when the Michigan Supreme Court rejected the "transactional" approach of Turner, that a robbery is not complete until the perpetrators reach a temporary place of safety. People v. Randolph, 466 Mich. 532, 648 N.W.2d 164-75 (2002).
In summary, we hold that the phrase contained in the robbery statute, "[a]n act shall be deemed to be included in the phrase `in the course of committing a theft,'" N.J.S.A. 2C:15-1a, refers only to those acts set forth in sections a(1), (2), and (3) of the statute which elevate simple theft, or attempted theft, to the crime of robbery. We also determine that the phrase does not encompass other acts committed by an alleged accomplice after all elements necessary to constitute the crime of robbery have concluded. To the extent that Williams, supra, 232 N.J.Super. 432, 557 A.2d 675 and Baker, supra, 303 N.J.Super. 411, 697 A.2d 145 hold to the contrary, we disagree.[8] Accordingly, we conclude that standing alone, defendant's instruction to Davis during the course of immediate flight to discard or hide the weapon used in the attempted theft does not constitute aiding or attempting to aid Davis in the commission of the attempted theft under the accomplice liability statute, N.J.S.A. 2C:2-6c(1)(b).
The jurors in this case were not provided with an instruction limiting their consideration of defendant's verbal direction to Davis to that of a factor, among others, in determining whether defendant shared the same intent as Davis to commit armed robbery. Nunez, supra, 209 N.J.Super. at 131, 506 A.2d 1295. Rather, the jury was permitted to consider defendant's verbal direction as an independent basis of his guilt of robbery under the accomplice liability statute. Because the jury was permitted to convict defendant of robbery under either theory of accomplice liability, we are constrained to reverse. See State v. Martin, 119 N.J. 2, 16-17, 573 A.2d 1359 (1990). We cannot determine whether the jury convicted defendant solely on his verbal direction to Davis during flight, or whether they only considered it as a factor in determining his shared intent to commit armed robbery.
We also reverse defendant's conviction of felony murder and possession of a weapon for an unlawful purpose. A defendant may not be convicted of felony murder unless he is convicted of the underlying predicate felony. State v. Grey, 147 N.J. 4, 16-17, 685 A.2d 923 (1996). Nor may a defendant be convicted of unlawful possession of a weapon unless he intended to use it unlawfully against the person or property of another. State v. Banko, 182 N.J. 44, 57, 861 A.2d 110 (2004). The conviction of possession of a weapon without having a permit is affirmed. Counts One, Two and Five are remanded to the trial court for re-trial.

* * * *
[At the direction of the court, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]

* * * *
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] A second Miranda hearing to determine the admissibility of defendant's December 21, 2002 statement was conducted during the trial on March 17, 2005.
[3] State v. Gross, 121 N.J. 1, 577 A.2d 806 (1990).
[4] Doctor Frederick J. DiCarlo of the Monmouth County Medical Examiner's Office testified at trial that Hernandez's toxicology report disclosed that the victim's blood alcohol concentration at time of death was .208 percent.
[5] See State v. Nunez, 209 N.J.Super. 127, 131, 506 A.2d 1295 (App.Div.1986) (determining it appropriate to charge accomplice liability where there is evidence of a defendant's presence at the scene of a murder, together with other factors from which a jury could infer murderous intent on the part of the defendant and principal), certif. denied, 107 N.J. 628, 527 A.2d 453 (1987). Accordingly, we are satisfied that defendant's instruction to Davis during flight could be construed as a factor among others by the jury to determine that defendant had the shared intent with Davis to commit armed robbery.
[6] The Court noted that the Legislature had amended the robbery statute in 1981 indicating the Legislature's intent to expand rather than narrow the scope of robbery. Accordingly, the Court determined that the phrase "injury or threats `to another' should include persons other than the property owner." Mirault, supra, 92 N.J. at 498 n. 7, 457 A.2d 455. This legislative amendment occurred one year after the robbery in Carlos, supra, 187 N.J.Super. 406, 455 A.2d 89.
[7] We recognize that the crime of robbery and the principle of accountability or accomplice liability are defined differently under the Illinois Criminal Code than under our Code, but we find the Illinois Supreme Court's analysis instructive.

Robbery is defined under 720 ILCS 5/18-1(a) as: "[a] person commits robbery when he or she takes property, except a motor vehicle covered by Section 18-3 or 18-4 [vehicular hijacking and aggravated vehicular hijacking respectively] from the person or presence of another by the use of force or by threatening the imminent use of force."
Under Illinois law a person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c).
[8] See Cannel, New Jersey Criminal Code Annotated, comment 7 on N.J.S.A. 2C:15-1, where the author questions the holdings of Williams and Baker, that acts other than force or threats thereof, may be used to extend the time for the completion of the crime of robbery, "when the robbery is complete and the period is extended to ensnare defendants who assist a robber during flight absent other evidence of the culpability of the assisting parties."