**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1800-21
            A-1105-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TACUMA E. ASHMAN,
a/k/a TACUMA C. ASHMAN,
TACUMA G. ASHMAN, and
TACUMA ERASTO ASHMAN,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHAWN B. HAREWOOD,
a/k/a SHAWN HAREWOOD,
SHAW BRIAN HAREWOOD,
and SHAWN BRANDON
HAREWOOD,

     Defendant-Appellant.

_____

Argued (A-1800-21) and Submitted (A-1105-22) December 10, 2024 – Decided February 18, 2025

Before Judges Smith and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 19-02-0239.

Marcia H. Blum, Assistant Deputy Public Defender, argued the cause for appellant Tacuma E. Ashman (Jennifer Nicole Sellitti, Public Defender, attorney; Marcia H. Blum, of counsel and on the brief).

Ron Bar-Nadav, attorney for appellant Shawn B. Harewood.

Ian C. Kennedy, Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-1800-21 (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent State of New Jersey in A-1105-22 (William P. Miller, Assistant Prosecutor, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

We consolidated these appeals, calendared back-to-back, to issue a single opinion. Defendants Tacuma Ashman and Shawn Harewood challenge their convictions of robbery and other offenses stemming from an incident in which

the State alleged Ashman and another co-defendant, Carl Harry,[1] held Safaree

Samuels and Corey Bryant at gunpoint to accomplish the theft. Harewood was

alleged to be the mastermind of the plan and the getaway driver. Originally,

Ashman and Harewood were tried together, but due to an illness in Harewood's

counsel's family, the trial court declared a mistrial only as to him; the first trial

continued for Ashman only, while Harewood was tried again.

A jury found Ashman guilty, and he was sentenced to two consecutive

fifteen-year terms of incarceration, each subject to the No Early Release Act

("NERA"), N.J.S.A. 2C:43-7.2. Before us, Ashman raises the following points

for our consideration:

> POINT I: THE BRYANT ROBBERY CONVICTION MUST BE VACATED BECAUSE: 1) THE STATE FAILED TO PROVE THE ESSENTIAL ELEMENT OF THEFT FROM BRYANT; 2) THE COURT CHARGED THAT THE THEFT REFERRED TO THE JEWELRY STOLEN FROM SAMUELS; 3) THE COURT DID NOT ANSWER THE JURY'S QUESTION ABOUT THEFT; AND 4) THE COURT FAILED TO CHARGE AGGRAVATED ASSAULT BY POINTING A GUN AS A LESSER-INCLUDED OFFENSE. [THE CUMULATICE EFFECT OF THE ERRORS MADATES REVERSAL]

> POINT II: MISTRYING THE CASE AS TO THE CODEFENDANT BUT NOT DEFENDANT LEFT THE JURY WITH ONLY DEFENDANT TO BLAME

---

[1] Harry pled guilty prior to trial and does not take part in this appeal.

A-1800-21

FOR THE OFFENSE AND VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL.

POINT III:  THE MATTER MUST BE REMADED FOR A NEW SENTENCING HEARING BECAUSE THE COURT EXPRESSLY STATED THAT IT WAS PENALIZING DEFENDANT FOR NOT ADMITTING HIS GUILT OR EXPRESSING REMORSE, RELIED ON DISMISSED CHARGES, AND MISAPPLIED THE YARBOUGH FACTORS TO REACH AN EXCESSIVE SENTENCE OF 30 YEARS, 25 1/2 YEARS WITHOUT PAROLE.

A subsequent jury found Harewood guilty, and he was sentenced to ten years imprisonment, with five years to be served without parole, consecutive to eight years imprisonment, subject to NERA.  Harewood raises the following arguments for our consideration:

POINT I:  THE COURT ERRED AND DENIED THE APPELLANT THE RIGHT TO A FAIR TRIAL BY REFUSING TO PROVIDE THE JURY WITH A CURATIVE INSTRUCTION BECAUSE THE IMPROPER PROSECUTOR'S COMMENT (DURING SUMMATION) UNFAIRLY SHIFTED THE BURDEN OF PROOF UPON THE DEFENSE.

POINT II:  THE COURT ERRED IN DENYING THE APPELLANT'S "REYES" MOTION SEEKING TO DISMISS THE CRIMINAL COMPLAINT/INDICTMENT AFTER THE CLOSE OF THE STATE'S CASE.

POINT III:  THE COURT SHOULD HAVE DENIED THE STATE'S REQUEST TO MAKE ANY

4

REFERENCE TO ANY TELEPHONE CALLS THAT APPELLANT MADE FROM THE BERGEN COUNTY JAIL.

POINT IV: THE COURT ABUSED ITS DISCRETION WHEN IT CHOSE TO SENTENCE THE APPELLANT CONSECUTIVELY ON COUNT 2 AND COUNT 6 OF THE INDICTMENT DISREGARDING THE REQUIREMENTS OF "YARBOUGH."

Having considered these arguments in light of the record and applicable legal standards, in A-1800-21, we affirm Ashman's conviction in part and vacate and remand in part to the Law Division for further proceedings consistent with this opinion. In A-1105-22, Harewood's appeal, we affirm his conviction and sentence.

I.

Safaree Samuels is a hip-hop and Caribbean music artist. In 2018, Samuels lived in an apartment building in Fort Lee. On the night of April 1, 2018, into the early morning of April 2, he performed at a party held at a restaurant in the Bronx. He wore jewelry to the performance, the appraised value of which exceeded $150,000. Prior to the performance, Samuels had posted photos of the jewelry on a popular social media website. Samuels was accompanied to the party by his stylist and Bryant, his part-time personal chef.

5                                                          A-1800-21

After performing, Samuels left in his car with his companions; he dropped his stylist off in the Bronx and drove back to the Fort Lee apartment with Bryant. He pulled his car into the parking garage and remained there with Bryant while conducting business on his phone.

When Samuels and Bryant got out of the car, two men approached them. The shorter man, whom Samuels described as wearing a green jacket and a hat, was holding a handgun. This man grabbed Bryant's arm and directed him to sit on the car. The second man, a "tall, dark-skinned guy" wearing a "black hoodie," patted down Bryant's pockets and put a hand inside them. Bryant testified that he had no concealed weapons or expensive valuables on his person, besides a pair of earrings. He did have an ID, debit card, keys, and phone, in a "slot" inside his jacket that the assailants did not locate. As a result, the men took nothing from Bryant but ordered him to lie on the ground; Bryant complied.

The gunman told Samuels to "give [him] everything," and specifically demanded his watch. Samuels testified that he was wearing a long red fur coat with sleeves that extended past his wrists and covered his watch such that the gunman would not have seen it. Samuels handed over his phones, wallet, watch, all his bracelets except one which had a special clasp that could not be easily opened, his necklaces, and approximately $2,000 in cash he had been given for

6

his performance that night. The gunman then ordered Samuels to lie on the ground next to Bryant. At that point, the gunman "snatched" Samuels's earring out of his ear.

Surveillance video taken from inside the parking garage, which was played for both juries, showed the robbery followed by two individuals jumping over a wall from the parking deck to the south side of the garage. When they realized the robbers had left, Samuels and Bryant ran into the apartment building and contacted police.

Samuels and Bryant both testified that they were too focused on the gun to get a "good look" at the perpetrators' faces. Samuels also said he did not see a second weapon but saw the second assailant hold his hand under his sweatshirt as if he was carrying a gun.

At around that time, Officers Natalie Mateus and Patrick Cillo of the Fort Lee Police Department were in a patrol vehicle about a block away from the apartment building, when, they saw a dark-colored Cadillac Escalade without a license plate traveling in front of them make an "erratic U-turn." The Escalade drove past the officers, who then tried to initiate a motor-vehicle stop using their lights and siren.

A-1800-21

Instead of stopping, the Escalade accelerated onto the bridge. The officers pursued it across, with Mateus testifying that the vehicle "swerve[ed] in and out of traffic" at speeds exceeding ninety miles per hour. The chase continued into New York City, where the Escalade eventually crashed into a median. Despite having two exploded tires, the vehicle continued on its rims until it stopped on the Henry Hudson Parkway near the exit for 158th Street in Manhattan.

Mateus testified that she saw three black males, jump out of the Escalade and run into oncoming northbound traffic, crossing the highway and then entering a wooded area. After confirming there was no one else inside the Escalade, the officers pursued the three men on foot into the trees.

Officer Gabriel Avella of the Fort Lee Police Department, who had joined in the pursuit over the Bridge, also testified he saw three black men exit the Escalade. He said the driver wore a green sweater and dark jeans, the front-seat passenger also wore dark jeans, and the rear-seat passenger wore whitewashed jeans and white sneakers. He joined the on-foot chase, but he and the other officers lost sight of the three men in the densely wooded area.

Officer Phillip Robinson of the New York City Police Department ("NYPD") and other officers searched the area around Riverside Park by the Henry Hudson Parkway where the suspects had fled. Robinson found

Harewood, who was wearing a green sweater or jacket, inside the park attempting to hide by lying flat on railroad tracks. Although Robinson told Harewood not to move, he attempted to escape by climbing over a wall but was apprehended. Shortly thereafter, Avella identified Harewood as the driver of the Escalade based on his clothing.[2]

Subsequent investigation revealed that Samuels had been friends with Harewood, and that the two had gone to high school together. Samuels testified that Harewood had worked for him during a tour sometime between 2012 and 2014, but that their friendship ended in 2015. During trial, Samuels did not identify Harewood as one of his assailants and he testified that he had never knowingly interacted with Ashman. Samuels also did not identify Ashman as one of the robbers in a pretrial photo array.

Police seized a phone found in Harewood's possession during his arrest, and later learned that a few days before the robbery that the phone's user made the following search query on the internet: "Do cops have access to housing

_____

[2] The NYPD also arrested a second man in the general area, Johnathan Ricketts, and charged him as one of the suspects in the robbery. However, his charges were dismissed when his clothing did not match the dash cam footage of the three individuals fleeing from the car and data taken from his cell phone showed that it was not near Samuels's apartment building at the time of the robbery.

building cameras?" The next day, the phone searched for the cost of apartments in Samuels's building.

Fort Lee Detective Jay Makroulakis found a GPS tracking device lodged in the rear wheel well of Samuels's car and determined Harewood's burner phone contained a mobile application to operate that device. On the night of the robbery, the burner phone's user entered the party's address and Samuels's home address into its applications.

Police searched the Escalade and found some of Samuels's stolen items inside, including a gold chain, a bracelet, an earring, and his wallet. They also found the Escalade's missing license plate and its registration. The car was registered to Harewood's mother, Annodette Harewood. When police searched the area where the two men seen on the parking deck surveillance video jumped over the wall, they found another of Samuels's bracelets on the ground.

Police also found Ashman's state identification card, debit card, and insurance card in the pocket of a green jacket found inside the Escalade. Also in a jacket pocket, they found a piece of paper with the phone number for Harewood's burner phone written on it. Police additionally found a red baseball cap in the rear of the vehicle, and a cell phone between the driver's seat and the center console of the car, which they later learned was registered to Ashman. A

A-1800-21

search of this phone revealed recent photographs of Ashman wearing the same green jacket and red hat found in the Escalade. Ashman was arrested based on the evidence in the Escalade.

Further investigation showed that days before the incident, Ashman received a text message from a phone number registered to Annodette Harewood. At his trial, Harewood admitted this phone was his. The message included two photographs of jewelry: a watch of the same make and model as the one stolen from Samuels, and a bracelet of the same make and model as the one the robbers were unable to remove from Samuels's wrist during the robbery. In another set of text messages, Ashman asked Harewood, "When we going to do this?" Harewood replied, "Where ur gonna gonna be tonight[?] Ima try to link tonight or tomorrow[.] Link ur man that u trust we gonna go see him!!" Ashman sent back, "Ok."

Special Agent John Hauger of the FBI, an expert in cell site analysis, analyzed location data from the two cell phones. He testified that on March 28 and 30, 2018, the two phones connected to towers near Samuels's apartment building. Neither phone connected to any towers in that area of Fort Lee before then.

11

On April 1, 2018, at 11:08 p.m., Ashman's phone accessed a tower in the Bronx. Data from Harewood's phone showed it was located at or near the venue while Samuels was performing. Then, both phones used towers near Samuels's apartment. Harewood's phone data showed it was located outside the parking garage between 1:36 a.m. and 2:01 a.m. The data also showed that minutes before Harewood's arrest, his phone was in the wooded area near Henry Hudson Parkway.

In June 2018, a grand jury charged each defendant with conspiracy to commit robbery, N.J.S.A. 2C:5-2 and 2C:15-1 (count one); two counts of armed robbery, one as to Samuels and one as to Bryant, N.J.S.A. 2C:15-1 (counts two and three); unlawful possession of a gun, N.J.S.A. 2C:39-5(b) (count four); possession of a gun for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); eluding, N.J.S.A. 2C:29-2(b) (count six); and resisting arrest by flight, N.J.S.A. 2C:29-2(a)(2) (count seven).

After several days of trial, Harewood's counsel was unable to continue. Harewood was granted a mistrial, but Ashman's motion for a mistrial was denied. At the close of the State's case, Ashman moved for acquittal. The court denied the motion except as to eluding, which was dismissed with the State's consent.

Pertinent here, as to the Bryant robbery charge, Ashman's counsel argued that there had been no testimony that the perpetrators took or even demanded anything from Bryant. The court denied Ashman's motion, finding that, giving the State the benefit of all its favorable evidence and reasonable inferences therefrom, the record was sufficient to allow a reasonable jury to find him guilty of robbing Bryant. It stated, "whether or not anything was actually taken from Corey Bryant," it was "clear" that both Samuels and Bryant "were held at gunpoint" while Samuels's jewelry was taken. The court further found there was evidence Bryant "was threatened with bodily harm," including being "pushed and ordered to get down on the ground" and being patted down and having his pockets searched.

The jury found Ashman guilty of the following: the lesser-included offense of conspiracy to commit theft; robbery of Samuels; robbery of Bryant; possession of a gun for an unlawful purpose; and resisting arrest by flight. It found him not guilty of unlawful possession of a handgun. However, just after excusing the jury, the court reviewed the verdict sheet and noticed that "not guilty" had been checked for the conspiracy to commit theft count and there was no answer to an interrogatory connected with resisting arrest by flight. The State

13

agreed to dismiss these counts. The court called the jury back, and it unanimously affirmed its guilty verdict on the other counts.

On February 4, 2022, the court sentenced Ashman to consecutive fifteen-year terms for the two robbery convictions, each with an eighty-five percent parole disqualifier under NERA. It merged count five.

In June 2022, Harewood's second trial began. After the close of the State's case, Harewood moved for a judgment of acquittal; the court denied it. It also denied his renewed motion for acquittal at the close of evidence.

Harewood testified at his trial. He confirmed that he and Samuels had known each other for over twenty years. Harewood testified that his friendship with Samuels did not end in 2015 like Samuels said it did. Harewood testified that on the date of the incident he drove to New York City in his mother's Escalade with Ashman, Harry, and Ricketts, and that they "hung out" and went to a party at a bar in the Bronx. He said Harry drove him, Ricketts, and some girls back to New Jersey because he was intoxicated. Harry dropped the girls off near the apartment. Harewood initially claimed Harry texted Samuels, and Samuels invited Harry and Ricketts into his apartment, saying the two went upstairs while he stayed in the Escalade. However, later, confronted with the

14

video showing the robbery taking place in the parking lot, he admitted neither Harry nor Ricketts went to Samuels's apartment.

Harewood said Ricketts was driving the Escalade when police began to chase it, and that Ricketts missed a turn and ended up driving over the GW Bridge. After Ricketts crashed the Escalade, Harewood, who was in the front passenger seat and still intoxicated, staggered out of the vehicle and ran away with his friends. He said he "found himself on Riverside Drive" where police arrested him.

Harewood claimed that police never took a phone from him and that the burner phone was not his. Harewood further stated that the phone that texted Ashman's was his mother's, that he never texted Ashman photos of Samuels's jewelry, and that Harry was the one who took the necklace and earring found in the Escalade from Samuels. While he admitted Ashman's identification card was found in the Escalade, he claimed the green jacket and red hat belonged to him and that he had loaned them to Ashman. Later in cross-examination, he admitted he used the phone registered to his mother and said he did not think his mother sent the jewelry photos to Ashman.

On July 13, 2022, the jury found Harewood guilty of the lesser-included offense of second-degree robbery of Samuels, eluding, and resisting arrest by

flight.  It acquitted him of the remaining counts.  The court sentenced Harewood to ten years' imprisonment for eluding, with five years to be served without parole, and to a consecutive term of eight years for robbery, subject to NERA's eighty-five percent parole disqualifier.  The resisting arrest count was merged.

## II.

Ashman first argues his conviction for robbing Bryant must be vacated because the State did not prove all the robbery elements.  He contends, at most, Bryant was a bystander to the theft from Samuels and the theft from Samuels alone cannot support two robbery convictions.

Regarding motions to dismiss, we review the sufficiency of the evidence de novo, applying the same standard as the trial court.  State v. Williams, 218 N.J. 576, 593-94 (2014).  At the close of the State's case the court shall "order the entry of a judgment of acquittal of one or more offenses charged . . . if the evidence is insufficient to warrant a conviction."  R. 3:18-1.  When deciding a defendant's motion for acquittal, the court must decide whether the evidence, "giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom," is sufficient for a jury to "properly find beyond a reasonable doubt that the defendant was guilty of the crime charged."  State v. Reyes, 50 N.J. 454, 458-59 (1967); State

16

v. D.A., 191 N.J. 158, 163 (2007). For a Rule 3:18-1 motion made after the State's case is complete, the court considers only the State's evidence. State v. Lodzinski, 249 N.J. 116, 140-41 (2021).

In pertinent part, N.J.S.A. 2C:15-1(a)(2) provides that a person is guilty of robbery "if, in the course of committing a theft," that person "threatens another with or purposely puts him in fear of immediate bodily injury." The statute states that an act occurs "in the course of committing a theft" for purposes of a robbery charge "if it occurs in an attempt to commit theft."[3] N.J.S.A. 2C:15-1(a)(3). Thus, the theft element of robbery is satisfied by an attempted or completed theft, defined in N.J.S.A. 2C:20-3(a) as the unlawful taking or exercise of unlawful control over another person's movable property with the purpose to deprive that person thereof. State v. Zembreski, 445 N.J. Super. 412, 433 (App. Div. 2016). In State v. Mirault, 92 N.J. 492, 499 (1983), the Court

---

[3] By contrast, aggravated assault under N.J.S.A. 2C:12-1(b)(4), requires that the State prove the defendant "[k]nowingly under circumstances manifesting extreme indifference to the value of human life point[ed] a firearm . . . at or in the direction of another . . . ." The two crimes do not require the same behavior by the defendant; the proof required to establish the "greater" offense of robbery would not be sufficient to establish every element of the "lesser" offense of aggravated assault by pointing. See State v. Thomas, 187 N.J. 119, 129-30 (2006). Thus, the court was correct in not charging aggravated assault as a lesser offense.

held that the word "another" in N.J.S.A. 2C:15-1(a) is "broadly encompassing"—"broader than 'him' or some other term restricted to the actual theft victim." As a result, if a perpetrator commits a theft or attempted theft against one person, and during that theft or attempted theft injures or threatens another person with injury, that perpetrator may be found guilty of robbing the second person even if nothing was taken from that person. Id. at 500. It follows that the State did not need to prove anything was taken from Bryant.

However, because Ashman was convicted of the robberies of both Samuels and Bryant, the question becomes whether the evidence sufficiently showed a separate attempted theft from Bryant. "Each robbery is a separate crime, which entails a discrete theft from a single victim together with accompanying injury or force," State v. Sewell, 127 N.J. 133, 137 (1992), to "another," who may be the theft victim or a different person. State v. Lawson, 217 N.J. Super. 47, 51 (App. Div. 1987).

In Sewell, the defendant grabbed a bucket of quarters belonging to a casino patron and ran off, in the process colliding with three women and struggling with a security guard. 127 N.J. at 135-36. He was charged with four counts of robbery, one for each of the people who suffered bodily injury during his theft from the owner of the quarters and convicted on three of them. Id. at

18

136. The Court found that while the evidence would support a charge of robbery concerning any one of the people struck by the defendant in his flight, it could not support multiple robbery charges because the defendant "had committed only one theft . . . ." Id. at 137-38. It therefore found the Appellate Division properly reversed the defendant's three convictions. Id. at 138.

Although only the theft from Samuels was successfully completed, there was sufficient evidence of a separate attempted theft from Bryant to satisfy the "in the course of a theft" element of N.J.S.A. 2C:15-1 as interpreted by the court in Sewell, 127 N.J. at 137-38. Bryant testified the perpetrator without the gun, whom the State alleged was Harry, patted him down and used his hands in searching his pockets, but missed his valuables in his jacket. Although the evidence showed a plan to rob Samuels, and Bryant was very likely an unexpected presence, on a motion for acquittal the State must be given the benefit of all reasonable inferences from the evidence it has presented. Thus, it is reasonable to infer that when encountered, Ashman and Harry decided to see if Bryant had valuables. The evidence also established that Bryant was threatened with immediate bodily harm when Ashman displayed the gun to him.

Ashman further posits the court erroneously instructed the jury that it could find him guilty of robbing Bryant if it found that Bryant was threatened

19

with force or put in fear of immediate bodily harm and that Samuels was the victim of a theft. Ashman argues this was improper, and the jury instead needed to find Bryant himself was the victim of a theft or attempted theft. He further argues the court's instructions on the lesser-included offenses of theft and attempted theft failed to clarify that the jury would need to find a theft or attempted theft from Bryant, not only from Samuels.

When the defense does not object to the jury instructions at trial, our review is under the plain error standard. R. 1:7-2; State v. Singleton, 211 N.J. 157, 182 (2012). "[P]lain error requires demonstration of '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Burns, 192 N.J. 312, 341 (2007) (quoting State v. Jordan, 147 N.J. 409, 422 (2007)). "[A]ny finding of plain error depends on an evaluation of the overall strength of the State's case." State v. Chapland, 187 N.J. 275, 289 (2006). Additionally, jury instructions which follow or closely track model charges are generally not considered erroneous. State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008). Alleged errors in jury instructions are reviewed in the context of the overall charge, not in isolation. Chapland, 187

N.J. at 289. We "consider the overall effect of the charge and look at the language in context to see whether the jury was misled, confused or inadequately informed." Jefferson v. Freeman, 296 N.J. Super. 54, 65 (App. Div. 1996). The charge "as a whole" cannot be misleading, and it must "set[] forth accurately and fairly the controlling principles of law." Ibid.

"It is axiomatic that appropriate jury instructions are essential for a fair trial." State v. Ball, 268 N.J. Super. 72, 112 (App. Div. 1993). Incorrect instructions are "poor candidates for rehabilitation under a harmless-error analysis," State v. Rhett, 127 N.J. 3, 7 (1992), and are "excusable only if they are harmless beyond a reasonable doubt." State v. Vick, 117 N.J. 288, 292 (1989). However, where a defendant does not request an instruction or object to the lack of one, the trial court's actions are reviewed under a plain error standard. State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2; R. 1:8-7.

When the trial court instructed the jury on robbery, it first stated count two of the indictment pertained to the alleged robbery of Samuels and count three pertained to the alleged robbery of Bryant. Next, it instructed the jury on the elements of robbery without reference to either victim. The court only instructed on these elements once and did not differentiate between what the State needed to prove as to Samuels and what it needed to prove as to Bryant.

21

The court's instructed the jury on first-degree robbery, telling them that the State needed to prove, beyond a reasonable doubt, that while in the course of committing a theft, Ashman "threatened another with or purposely put him in fear of immediate bodily injury." The court explained that "in the course of committing a theft" includes actions "in an attempt to commit the theft, during the commission of the theft itself, or in immediate flight after the attempt or commission," as stated in N.J.S.A. 2C:15-1(a).

As to theft from the person, the court instructed that the State needed to prove beyond a reasonable doubt: "[o]ne, that the defendant knowingly took or unlawfully exercised control over movable property; two, that the movable property was property of another; three, that the movable property was taken from the person of another; and four, that defendant's purpose was to deprive the other person of the movable property." The court stated, "[i]n this case the State alleges that the movable property taken or over which control was unlawfully exercised was jewelry."

The court's instruction on robbery was clear: the State needed to prove beyond a reasonable doubt that Ashman was "in the course of committing a theft." The court further explained that this could include a completed or attempted theft. However, it did not say "in the course of committing a theft or

attempted theft from Bryant." As discussed above, taking the count concerning Bryant completely on its own, Ashman could be found guilty of robbing Bryant if the State proved that he threatened Bryant with immediate bodily harm while committing theft against Samuels. See Mirault, 92 N.J. at 499-01. However, the jury could not properly convict Ashman of two counts of robbery, one against Samuels and one against Bryant, based solely on the theft from Samuels. See Sewell, 127 N.J. at 137-38. Moreover, the court's instructions on theft and attempted theft as lesser-included offenses of robbery failed to clarify that the State had to prove there was an attempted theft from Bryant. Instead, the court stated that both theft and attempted theft applied only to the theft of Samuels's jewelry. We conclude the trial court's failure to instruct the jury that it must find Ashman committed a separate theft or attempted theft as to Bryant in order to find him guilty was reversible error. The court's instruction caused jury confusion, evidenced by the question they posed to the court during deliberations, "[i]s a theft that occurred to one person also associated with a second party that is present?" The answer from the court did not clarify that each count needed its own victim. Without a finding on the essential element of theft

A-1800-21

or attempted theft from Bryant, the conviction and sentence for first-degree robbery of Bryant must be vacated and remanded for a new trial.[4]

### III.

Harewood first argues the trial court erred by denying his request for a curative instruction after the prosecutor remarked during summation that his testimony was "an implausible story" while the State's evidence was "fully supported by the evidence." He argues this comment "unfairly shifted the burden of proof" by implying that he "could not prove his version of events."

Overall, we "must assess the prosecutor's comments in the context of the entire trial record." State v. Nelson, 173 N.J. 417, 472 (2002). We include whether the trial was lengthy and the prosecutor's remarks short or "errant." State v. Engel, 249 N.J. Super. 336, 382 (1991). Additionally, we may consider whether the trial court issued or should have issued a curative instruction, recalling that the decision to do so is a matter "peculiarly within the competence of the trial judge . . . ." State v. Winter, 96 N.J. 640, 646-47 (1984). Where a prosecutor's comments are "only slightly improper," a general jury charge to the effect that statements during summation are not evidence and should be

---

[4] Because we are vacating the conviction on this count (count three), the other arguments raised by Ashman are moot.

disregarded if they conflict with jurors' recollections of events "may serve to ameliorate potential prejudice . . . ." State v. Frost, 158 N.J. 76, 86-87 (1999); State v. Ramseur, 106 N.J. 123, 323 (1987). It is presumed that the jury faithfully followed the instructions it received. State v. Santamaria, 236 N.J. 390, 413 (2019).

Moreover, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented," and they are "expected to make vigorous and forceful closing arguments to juries." Frost, 158 N.J. at 82. However, "a prosecutor must refrain from improper methods that result in a wrongful conviction . . . ." State v. Smith, 167 N.J. 158, 177 (2001).

Specifically, a prosecutor may not "personally vouch for" a witness's credibility. State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004). This is because "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant . . . ." United States v. Young, 470 U.S. 1, 18 (1985). However, even if a prosecutor strays from this rule and commits impropriety by stating that a witness was truthful, a reversal may not be warranted if a witness's credibility was highly contested at trial and the jury was exposed to both sides

of the argument through cross-examination.  State v. Marshall, 123 N.J. 1, 156-57 (1991).  Additionally, if a prosecutor's statement regarding a defendant's guilt or another witness's credibility "contain[s] no suggestion" of reliance on evidence outside the record and instead refers to the witness's own testimony or other properly adduced evidence, it does not constitute misconduct.  Young, 470 U.S. at 19.  Additionally, statements by a prosecutor that would otherwise be prejudicial "may be deemed harmless if made in response to defense arguments."  State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011).

In his closing statement, Harewood's counsel insinuated that perhaps Samuels had staged the entire incident, commenting, for example, that it was odd Samuels kept Bryant in the car with him for several minutes and it "just so happen[ed] that at the very time the two [assailants] come upstairs that he [said] let's get out of the car."  He also referenced a television interview Samuels gave shortly after the robbery, in which he talked about the incident without appearing upset and promoted his music.  Counsel implied it was suspicious Samuels had gotten his jewelry appraised "less than two weeks" before the robbery.  He urged the jury to evaluate Samuels's credibility carefully, saying that real life is not "like a reality TV show."

During summations, the prosecutor argued that the surveillance video showed one of the perpetrators wearing a green jacket and red hat, that such clothing was found inside the Escalade, and that there was a photo of Ashman wearing those clothes on his phone. The prosecutor described Harewood's attempt to explain away this evidence was "implausible." He further told the jurors they should "decide for [them]selves whether the defendant was being truthful to [them] or not" when he claimed he did not have a cell phone with him when he was arrested and that police never took one from him. He additionally stated the jury would need to evaluate "whether [Harewood was] being truthful" about the presence of Ashman's identification and other items being found in the Escalade, particularly in light of Harewood's claims that the jacket and hat were his and that Ashman had accidentally left his phone behind and was not in Fort Lee during the robbery.

Finally, toward the end of his closing the prosecutor discussed Harewood's testimony that Harry and Ricketts went to Samuels's apartment and that Ricketts was driving the Escalade when police chased it. He stated,

> [t]hat's [Harewood's] story. It's completely implausible. It's entirely implausible. We talked about credibility, and [defense counsel] asked you, he said— you know, he told you this isn't a popularity contest. It's not who you like more. He's absolutely right. It's not who you like more. It's who do you find more

credible?  What evidence do you find more convincing?
Is it the defendant's story, right, or is it the State's
evidence that's fully corroborated, you know,
independently.

After the prosecutor finished, defense counsel objected, arguing while the State could comment on Harewood's "truthfulness," it could not "say which story is more believable."  Counsel asserted, by asking the jury which version of events was "more believable," the State had shifted the burden to Harewood to demonstrate his innocence.

The court determined the prosecutor's comment did not imply a burden shift to the defense.  It stated, "[t]he defendant took the stand.  His credibility is at issue when he testifies.  I think it's more—it goes more to whether or not you believe his testimony or not.  Again, it doesn't go to the burden of proof shifting to the defendant."  As a result, the court denied Harewood's request for a curative instruction regarding the prosecutor's remark.

The prosecutor's remarks fell within the "considerable leeway" he was granted to comment fairly on the evidence presented.  Frost, 158 N.J. at 82. Although he described Harewood's account as "implausible" and said the State's case was "corroborated," it did not appear that he referenced any evidence outside the record to which he was privy.  Instead, the prosecutor referred throughout his summation to testimony and other evidence presented throughout

28

the trial. Contrary to defense counsel's argument at trial, the prosecutor did not say which party's version of events the jury should believe. Instead, he asked the jurors which they thought was more credible and urged them to evaluate the witnesses' truthfulness themselves. The characterization of Harewood's story as "implausible" did not inappropriately imply the burden of proof had shifted to Harewood to prove his innocence. Additionally, the court gave the type of general instruction deemed appropriate in Frost, 158 N.J. at 86-87.

Harewood next contends the court erred by denying his motion for acquittal. He contends there was "no real evidence that [he] was involved in the robbery, insufficient proof that he was an accomplice, and not one shred of evidence that [he] had any reasonable link to a claim of a weapon." He also argues there was "zero proof offered by the State that [he] was driving" the Escalade.

Following argument, the trial court denied Harewood's motion and the court cited to evidence the State presented. For each count against Harewood, the court found based on the evidence and all reasonable favorable inferences stemming therefrom, there was sufficient evidence for a reasonable jury to find Harewood guilty beyond a reasonable doubt. Following the close of all the evidence, Harewood renewed his motion. The court stated without elaboration

that the motion was again denied for the same reasons as to the motion at the end of the State's case.

We apply a de novo standard of review when deciding whether a motion for acquittal was properly denied. Williams, 218 N.J. at 593-94. At the outset, Harewood's argument there was no evidence tying him to the possession or use of a weapon is irrelevant since he was acquitted of the weapons possession charges and convicted of the lesser-included offense to armed robbery of second-degree robbery, which does not require the use of a weapon. N.J.S.A. 2C:15-1.

We conclude there was no error in the trial court's denial of Harewood's motion for acquittal. Although the State's evidence concerning Harewood's role in the robbery was circumstantial, this does not mean it was insufficient for a conviction. State v. Fiorello, 36 N.J. 80, 87-88 (1961). This evidence included: text messages between Harewood and the gunman; Ashman, sharing photos of two expensive and presumably rare pieces of jewelry of the same types owned by Samuels; Samuels's testimony that one of these items was indeed stolen from him and that the other would have been if it did not have a special clasp protecting it; the presence of a GPS tracker application on Harewood's phone matching the device found on Samuels's car; and data from Harewood's phone

30

placing him not only near The Modern in the early morning hours—where he admitted he was in his own testimony—but also near the venue while Samuels was performing. It may be reasonably inferred from this evidence that Harewood was involved with a plan to steal the jewelry in the pictures.

Harewood next posits the court erred by allowing the State to present evidence or make any mention of a telephone call he made from the Bergen County Jail. He asserts the jurors' knowledge that he was incarcerated pending trial "clearly had the potential to negatively influence" the verdict. Harewood further contends the State's request to cross-examine him about the call if he testified was an "unfair trial tactic," and that the call was provided to the State "based on a defective warrant." He also asserts the phone call "had no real probative value to the issues in the case," and even if it did, the prejudice to his case "seriously outweigh[ed]" that value.

We review a trial court's evidentiary rulings for abuse of discretion. Those rulings are entitled to deference absent a showing that there has been a clear error of judgment. State v. Singh, 245 N.J. 1, 12 (2021). Such rulings "are subject to limited appellate scrutiny," State v. Buda, 195 N.J. 278, 294 (2008), since trial judges enjoy "broad discretion" in making evidence-related decisions. State v. Harris, 209 N.J. 431, 439 (2012).

During trial, the prosecutor informed the court about a phone call Harewood made to a friend named "Ant" from the Bergen County Jail the previous day. During this call, Harewood "admitted" he used his phone to conduct the search the State had presented during its case about whether police had "access to housing building cameras." The prosecutor asked the court for a hearing on whether the State could cross-examine Harewood regarding the call if he chose to testify or reopen its case to present the call to the jury if he did not.

At the hearing, the court found the portion of the call at issue was admissible as a statement by a party opponent under N.J.R.E. 803(b)(1). It also found the statement was voluntary under N.J.R.E. 104(c). Conducting an analysis under N.J.R.E. 403, the court found the "vast majority" of Harewood's conversation had "very little probative value." However, it found the portion concerning police access to security cameras was relevant, and that its probative value outweighed "any prejudicial value." The court additionally found there was "nothing defective about the subpoena." The court granted the State's request to admit only that portion of the call and stated it would give "a limiting instruction about the fact that [it was] taking place from the jail." Before Harewood testified, the court warned him that based on its ruling, the prosecutor

A-1800-21

could bring up his phone call from jail if he made any statement contradictory to what he said in the call.

During cross-examination, the prosecutor asked Harewood whether he typed the query "Do cops have access to housing cameras?" into his phone, and Harewood replied, "I don't think I did." The prosecutor asked if he "recall[ed] calling [his] friend Ant," and whether he "recall[ed] that [he] discussed this search." Harewood answered he remembered calling Ant, but not discussing that particular topic. The prosecutor read the relevant portion of the call transcript, as follows:

> She had a camera in the building and I'm like yo, how are you reporting this to the police? Do they—don't they have access to the—to the building? The police have access to the buildings? That text or whatever, that was like—like—like, I don't know, bro. I don't know, son.

The prosecutor asked whether, in the call, Harewood was "explaining to Ant [his] reasoning—supposedly why [he] wrote this in the [browser] search" on the phone. Harewood replied, "[n]o, because recently my mother's package was missing from our building and I was talking about my mother, not a [browser] search." The prosecutor pointed out that on the call, Harewood referenced "a lady" when talking about the cameras, and asked whether he would commonly speak of his mother with that term. Harewood replied, "Yes." At no

33

time did the prosecutor make it known to the jury the call between Harewood and Ant was made from jail.

At the outset, it is unclear why Harewood has argued he suffered prejudice from the jury learning he was incarcerated, because the jury was not informed of this fact. Harewood's argument that the State's warning that it would bring up the call if he testified was an unfair tactic lacks merit. Harewood was clearly not dissuaded from testifying. Moreover, the court did not err by finding the probative value of the small part of the jail call used by the State outweighed any prejudice to Harewood.

Under N.J.R.E. 803(b)(1), prior out of court statements by a party opponent are not excluded as hearsay. Additionally, a prior inconsistent statement by a witness is admissible under N.J.R.E. 803(a)(1). Under N.J.R.E. 607, any party may "introduce extrinsic evidence relevant to the issue of credibility" to "attack[] or support[] the credibility of a witness . . . ." Thus, any witness "may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony." State v. Silva, 131 N.J. 438, 445 (1993).

The call with Ant contradicted Harewood's testimony, by suggesting Harewood had been considering the topic of how security cameras work and whether police have access to cameras. This called Harewood's credibility into

question, as permitted under N.J.R.E. 607. However, Harewood had the full chance to explain his reason for bringing the subject up. Any "prejudice" to Harewood was no greater than that caused by any other impeachment evidence.

Additionally, Harewood's argues the subpoena used to obtain the jail call was defective. Harewood's counsel's argument below was simply that it was wrong for the Sheriff's Office to monitor and produce Harewood's phone calls at all. We have held that such action by law enforcement is not inappropriate, and indeed that an inmate's "privacy entitlements must yield to the institution's responsibility to preserve the health and safety of the prison population" and its need to "prevent[] inmates from planning or participating in crimes that will take place outside the facilities' walls." State v. Jackson, 460 N.J. Super. 258, 276-77 (App. Div. 2019). Particularly, since Harewood was informed that his call would be monitored and recorded, there was a "reasonable expectation that law enforcement [would] hear [his] calls." Id. at 277. The facility is not limited in its ability to "divulge the information to prosecutors," even if that information does not pertain to prison security. Ibid. Here, Harewood's calls were routinely monitored, and a subpoena was obtained to have them turned over.

Finally, Harewood argues his sentence is excessive, and the court erred by imposing consecutive sentences for robbery and eluding because the two

charges were "part of the same criminal episode."  "Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard."  State v. Blackmon, 202 N.J. 283, 297 (2010).  A trial court enjoys "considerable discretion in sentencing."  State v. Blann, 429 N.J. Super. 220, 226 (App. Div. 2013), rev'd on other grounds, 217 N.J. 517 (2014).  An appellate court first must review whether the sentencing court followed the applicable sentencing guidelines set forth in the Code of Criminal Justice.  State v. Natale, 184 N.J. 458, 488-89 (2005); State v. Case, 220 N.J. 49, 63 (2014).

Harewood was sentenced to eight years for the second-degree robbery of Samuels and a consecutive sentence of ten years for second-degree eluding. N.J.S.A. 2C:43-6(a)(2) dictates that a sentence for a second-degree offense be between five and ten years.  Defendant's sentence for both offenses for which he was convicted thus fell within the permitted range.  Moreover, Harewood does not challenge the aggravating factors the court found.  He only challenges that they run consecutively.

N.J.S.A. 2C:44-5(a) provides that, when multiple sentences are imposed, these sentences "shall run concurrently or consecutively as the court determines at the time of sentence."  "[T]here is no presumption in favor of concurrent sentences and therefore the maximum potential sentence authorized by the jury

verdict is the aggregate of sentences for multiple convictions." State v.

Abdullah, 184 N.J. 497, 513-14 (2005).

State v. Yarbough, 100 N.J. 627, 643-44 (1985), requires that these criteria

be considered "when sentence is pronounced on one occasion on an offender

who has engaged in a pattern of behavior constituting a series of separate

offenses or committed multiple offenses in separate, unrelated episodes:"

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence shall be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous.

A-1800-21

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .

The "no free crimes" guideline stated in Yarbough factor one "does not require the court automatically to impose consecutive sentences for multiple offenses." State v. Rogers, 124 N.J. 113, 121 (1991). Instead, the sentencing court must consider all the Yarbough guidelines, with emphasis on the subparts of the third guideline. Ibid. These criteria should be applied qualitatively, not quantitatively, and consecutive sentences may be imposed even when a majority of the subparts support concurrent sentences. State v. Carey, 168 N.J. 413, 427-28 (2001). If a sentencing court fully evaluates the Yarbough factors, its decision will not usually be disturbed on appeal. State v. Miller, 205 N.J. 109, 129 (2011).

When setting forth Harewood's sentence, the court correctly addressed the Yarbough factors and found they weighed in favor of consecutive sentences for the robbery and eluding counts. The court agreed with the State that although the two crimes "occurred close in time," they "were separate crimes with separate victims." The jury concluded Harewood's conduct in driving the

Escalade at over ninety miles per hour while attempting to avoid police created a risk of death or injury to another person or persons, not Samuels, the victim of the robbery. Thus, there were different facts and different victims for the eluding and the robbery, supporting consecutive sentences under Yarbough. Moreover, the two crimes had different objectives: one was to obtain jewelry, the other was to escape punishment.

To the extent we have not specifically addressed any remaining arguments, it is because we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

In A-1800-21, we affirm in part and reverse in part. We vacate the sentence and conviction only as to Count three, Ashman's robbery on Bryant, and remand for a new trial. In A-1105-22, we affirm. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION